D.  <u>The Individual Defendants Are Not Entitled To Qualified Immunity Because A Reasonable Person Would Have Known That His Conduct Violated The Law.</u>[1]

A government official performing discretionary functions[2], is only shielded from liability for money damages insofar as his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[3] <u>Yerardi's Moody Street Restaurant & Lounge v. Board of Selectman of the Town of Randolph</u>, 878 F.2d 16, 19 (1st Cir. 1989). See also <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Both the federal Civil Rights Act, 42 U.S.C. §1983 and the MCRA utilize the same principles to determine whether an individual is entitled to qualified immunity. See <u>Duarte v. Healy</u>, 405 Mass. 43, 47, 537 N.E. 2d 1230, 1232 (1989); <u>Howcroft v. City of Peabody</u>, 51 Mass. App. Ct. 573, 595, 747 N.E.2d 729, 746 (2001).

A two part analysis is utilized to assess whether or not an

---

[1] The Plaintiff acknowledges that pursuant to <u>Howcroft v. Peabody</u>, 51 Mass.App.Ct. 573, 591-592, 747 N.E.2d 729 (2001) the Town of Raynham is not a "person" under the MCRA.

[2] A discretionary function is defined as a situation when a government official uses judgment and discretion when deciding what type of action to take in a particular case. <u>Pina v. Commonwealth</u>, 400 Mass. 408, 415, 510 N.E.2d 253 (1987).

[3] Count IV of the Complaint does not state a claim against the Defendants in their official capacity; the Complaint only seeks entry of judgment against the Defendants in their individual and personal capacities. Therefore, this opposition shall not address the Defendants' argument that they cannot be sued in their official capacities under the MCRA.

14

individual is entitled to qualified immunity. First, the law must be examined "to determine whether the right allegedly violated was 'clearly established'; if so, the defendant should have reasonably known of the right." Yerardi's Moody Street Restaurant & Lounge v. Board of Selectman of the Town of Randolph, 878 F.2d 16, 19 (1st Cir. 1989) quoting Rodriguez v. Comas, 875 F.2d 979, 981 (1st Cir. 1989). What constitutes a clearly established right has been further clarified as follows:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell v. [Forsyth], 472 U.S. [511] at 535, n.12 (1985); but it is to say that in the light of preexisting law that unlawfulness must be apparent.

Yerardi's Moody Street Restaurant & Lounge v. Board of Selectman of the Town of Randolph, 878 F.2d 16, 19 (1st Cir. 1989) quoting Anderson v. Creighton, 483 U.S. 635 (1987). Second, the court must determine whether it was objectively reasonable for the official to believe that his actions did not violate a clearly established right. Yerardi's Moody Street Restaurant & Lounge v. Board of Selectman of the Town of Randolph, 878 F.2d 16, 19 (1st Cir. 1989) quoting Rodriguez v. Comas, 875 F.2d 979, 981 (1st Cir. 1989).

Accepting the Plaintiff's factual averments as true and drawing all reasonable inferences therefrom, Pasdon v. City City of Peabody, 330 F.Supp.2d 22, 24 (D. Mass. 2004), it is clear

15

that the Defendants violated the Plaintiff's clearly established property rights as detailed above. These three rights have a long history and are clearly defined. <u>Greinier v. Zoning Board of Appeals of Chatham</u>, 62 Mass. App. Ct. 62, 67, 814 N.E.2d 1154 (2004) (well established principle that a governmental regulation which unduly burdens private property interests can amount to a taking); <u>Forsyth School for Dental Hygienists v. Board of Registration in Dentistry</u>, 404 Mass. 211, 214, 534 N.E.2d 773 (1989)(recognizing individual's right to engage in any lawful occupation); <u>Bell v. Mazza</u>, 394 Mass. 176, 178, 474 N.E.2d 1111 (1985) <u>quoting</u> <u>Brett v. Building Comm'r of Brookline</u>, 250 Mass. 73, 77, 145 N.E. 269 (1924) (right to own property includes right to use and improve the land).

Application of the second part of the analysis to the facts at hand, leads to the conclusion that a reasonable person would have realized that his conduct violated the Plaintiff's clearly established property rights. <u>Yerardi's Moody Street Restaurant & Lounge v. Board of Selectman of the Town of Randolph</u>, 878 F.2d 16, 19 (1st Cir. 1989). The Defendants, purporting to act pursuant to M.G.L. c. 111, §143, issued a site assignment which included findings that the Plaintiff's proposed Facility would not result in a nuisance; would not be harmful or dangerous to the public health; and, would not be attended by noisome and injurious odors. Exhibit 1, pp. 4-6. The Defendants' findings

16

precluded them from issuing a site assignment. <u>American Friends Service Committee of Western Massachusetts v. Commissioner of the Department of Environmental Protection</u>, 30 Mass. App. Ct. 457, 460 (1991), 569 N.E.2d 833; M.G.L. c. 111, §143. Nonetheless, the Defendants ignored the restrictions imposed upon them by M.G.L. c. 111, §143, and issued a site assignment which included, a provision preventing EarthSource from obtaining a certificate of occupancy until the inter-municipal sewer agreement was renegotiated. A reasonable member of a Board of Health would have known that EarthSource would be unable to occupy and use the facility until such time as it received its certificate of occupancy. A reasonable member of the Board of Health also would have known that the Order exceeded the Board of Health's authority and that such an Order would deprive the Plaintiff of its rights. Under these circumstances, a reasonable official would have known that his conduct violated the Plaintiff's clearly established rights. Accordingly, the Defendants are not entitled to qualified immunity.

IV. <u>CONCLUSION</u>

The Complaint, and any inferences contained therein, sets forth sufficient allegations to support relief pursuant to Count IV of the Complaint.

# EXHIBIT 1



# TOWN OF RAYNHAM

**SELECTMEN AND BOARD OF HEALTH**

53 ORCHARD STREET

RAYNHAM, MASSACHUSETTS 02767

TEL. (508) 824-2707

FAX: (508) 823-1812

| | |
|---|---|
| PUBLIC HEARING PURPOSE AND AUTHORITY: | Site Assignment Pursuant to M.G.L. c.111, Section 143 |
| PROPONENT: | EarthSource, Inc., 1958 Broadway, Raynham, MA 02767 |
| SITE & ZONING: | Tax Assessor's Map 1, Lot 15. Industrial Zone. |
| SUBJECT USE: | Facility that will accept for treatment entirely within enclosed processes, wastewater collected from septic tanks and food grease collected from restaurant and other food establishments. |

## FINDINGS

Upon conclusion of the public hearing and consideration of testimony received, the Town of Raynham Board of Health ("Board") makes the following Findings & Determinations.

1. Earth Source, Inc. ("Proponent") intends to construct and operate a state-of-the-art wastewater and grease treatment plant that will process human wastewater that is collected from septic tanks, and food grease that is collected from so-called grease traps at food establishments ("Facility"). No hazardous wastes or toxic wastes will be accepted at the Facility.

2. The Facility is engaged in the treatment of wastewater which itself is a highly regulated enterprise that is controlled through various laws and regulations. Significant regulatory and permitting safeguards exist and are administered by the Massachusetts Department of Environmental Protection ("DEP") and by Boards of Health in many communities. These safeguards include regulation of the composition of the wastewater pursuant to 314 CMR 7 & 12 to ensure hazardous substances are excluded and the regulation of all trucks that collect wastewater from septic tanks by the DEP and by the Boards of Health in each community in which they operate pursuant to 310 CMR 32.40 and 310 CMR 15. All such collection trucks must also be licensed by this Board if they intend to utilize the Facility.

3. DEP regulations at 310 CMR 32.30(5) expressly prohibit the Proponent's Facility from

Page 1 of 6

creating a nuisance or threat to the public health or a threat to the environment. The Facility also cannot discharge its water into the sewer system without first receiving various permits as required by 314 CMR 7 & 12 and by 257 CMR 2. Lastly, DEP air pollution regulations, 310 CMR 7.09(1), prohibit the emission of offensive dust or odors from the Facility. To comply, the Facility shall include an odor control system that ensures that the requirements of 310 CMR 7.09(1) are satisfied.

4.    The solids generated by the Facility's treatment process cannot be used for farming or other beneficial purposes unless it satisfies rigorous DEP standards required by 310 CMR 32. These DEP standards include the requirement for continuous testing of the treatment process to ensure mandated pH levels are maintained pursuant to 310 CMR 32.13(6) and Table 32.13. Existing DEP regulations require that this Board be given the opportunity to be an active participant in the DEP's review and approval processes [310 CMR 32.13(8) through (10); 32.14(1)(c) and (2)], and that the Proponent provide this Board with access to all records and reports [310 CMR 32.60(1)].

5.    The parcel on which the facility is proposed ("Site") is industrial zoned, and is adjacent to the Raynham-Taunton Greyhound Park on Route 138 (Broadway), a State highway. The portion of the Site that is being improved contains approximately 5 acres, is now entirely covered with asphalt paving, and is currently used for commercial trucking purposes with approximately 160 daily trips. The site and adjoining land, which includes the Raynham-Taunton Greyhound Park, currently supports as many as 10,000 truck and automobile vehicle trips daily.

6.    The Raynham Planning Board issued its approval of the Proponent's intended improvements to the Site as reflected in the site plan approved on February 27, 2003 ("Site Plan"). Residential homes are sufficiently distant from the Site. The approved Site Plan requires that the Proponent satisfy landscaping, motor vehicle routing, storm water control, and other beneficial requirements when constructing its Facility. The Board requires that all of the requirements of the Site Plan, as approved by the Raynham Planning Board, will be fully satisfied by the Proponent.

7.    The Proponent's Facility is not a wastewater treatment plant that is typically constructed by municipalities or other private operators. The typical wastewater treatment plant has its entire treatment process open to the environment. The Proponent's Facility is materially different. The Facility will have its entire treatment process contained within enclosed vessels and piping, and these vessels and piping will also be completely contained within a 14,000 square foot building. All venting of the treatment process will pass through an odor control system before being discharged to the environment.

8.    The Facility will have a treatment capacity of 99,500 gallons per day of wastewater. The wastewater will be pumped directly into the Facility from collection vehicles. These collection vehicles are subject to independent regulation and licensing by the Board pursuant to 310 CMR 15 (Title V of State Environmental Code). These collection vehicles must also meet the stringent

requirements required by the DEP in 310 CMR 32.40(2) and 32.40 (3). All solids transported from the Facility shall be transported in a watertight container or by other means acceptable to the DEP pursuant to 310 CMR 32.40(2). The Proponent has assured the Board that it will not accept wastewater from any collection vehicle that has not been properly licensed by the Board. As shown on the Site Plan, any accidental spillage during this pumping stage will discharge into drains that are also directed into the Facility.

9.  All wastewater will be completely contained within treatment vessels and process piping from the moment of entry into the Facility. During the treatment process no offensive odors shall escape to the environment because of the Facility's odor control system. The DEP has reviewed the odor control system and determined that no air quality permit is needed under 310 CMR 7.

10. The treatment process will result in solids being removed from the wastewater. Both the removed solids and the remaining water are regulated by the DEP.

11. The Proponent's Facility will place the solids through a filter press process where lime is added until a minimum pH level of 12 is reached. By achieving a minimum pH level of 12, the solids shall not be capable of omitting offensive odors, or of attracting pests or vermin. The DEP and the Board mandate that the Facility routinely test to ensure that the solids meet the minimum pH level. The testing and reporting requirements are mandated by 310 CMR 32.13 and 32.60, and the Board shall have access to all such test information and reports pursuant to 310 CMR 32.60(1). As a secondary precaution the Facility shall contract with a licensed pest control contractor to ensure that pests and vermin are not problematic. The fully treated solids will be trucked away from the Site. In addition, after treatment, the solids may qualify for future designation as a "Type I Sludge" by DEP, thereby allowing the solids to be used in farming.

12. The Proponent's Facility shall process the water to meet the quality requirements for discharge into the Raynham municipal sewer system. The Proponent has received a sewer connection permit from the DEP, Permit No. W034495.

13. The design of the Proponent's Facility has been reviewed and approved by the DEP, Approval Letter dated December 8, 2003.

14. A total of 60-80 daily vehicle trips are expected by the Proponent. This will be a net reduction from the 160 trips that the Site currently supports. The Site is also co-located with the Raynham-Taunton Greyhound Park and uses a common entrance from Route 138. The combined motor vehicle traffic at this locus often exceeds 10,000 trips per day.

## JURISDICTION

M.G.L. c. 111, Section 143, confers jurisdiction on the Board to issue a Site Assignment if it determines that any trade or employment may result in a nuisance, or may be harmful or

dangerous to public health, or may be attended by noisome and injurious odors. In order to properly meet its obligations the Board decided to conduct a public hearing, to hear testimony, and to make the appropriate determinations with respect to the Proponent's Facility. The Board opened a public hearing on June 24, 2003, which was continued and closed on December 9, 2003.

At the Board's request, Mr. Jeffrey Gould from the DEP attended the initial public hearing to advise the Board. The Board acknowledges and thanks Mr. Gould for his contributions.

## DETERMINATIONS

1.  **Public Safety Generally**

The Facility is engaged in the highly regulated enterprise of wastewater treatment that ensures that the collection and transportation of wastewater is safely undertaken. Extensive, ongoing controls will apply to the Facility through DEP regulation. Transporters of wastewater will also be regulated by the DEP and by Boards of Health in each community in which they operate. The Board will have ongoing jurisdiction over every transporter of wastewater to the Facility.

The Facility cannot discharge its water into the sewer system without first receiving various governmental permits. The solids generated by the Facility's process cannot be used for farming or other beneficial purposes unless it satisfies rigorous DEP standards, including testing requirements.

As part of the Proponent's reporting requirements under 310 CMR 32.60, it shall include a protocol for responding to and recording any complaints it may receive from the public for excessive noise, odors or other nuisances. The Proponent shall provide a copy to the Board of the annual report it must submit to the DEP pursuant to 310 CMR 32.60(2)(c). All tests and records required to be maintained by the DEP shall be made available for the Board to inspect pursuant to 310 CMR 32.60(1).

The Board determines that existing regulatory safeguards that apply to the Facility provide for the public safety.

2.  **Offensive Odors**

The Facility proposed by the Proponent will not have any segment of its treatment process exposed to the outside environment until after the minimum pH level of 12 is achieved. There will be no outdoor wastewater treatment as is typical in municipal wastewater treatment plants. The building and Site will be improved consistent with the Site Plan as approved by the Raynham Planning Board.

No wastewater odors will be permitted to escape to the environment without first passing

through the odor control system and as required by 310 CMR 7.09(1) Any accidental spillage that may occur when wastewater is initially pumped into the Facility will be collected in drains and directed into the Facility. Solids will leave a filter press with a pH level of 12 or greater with routine testing to ensure compliance pursuant to 310 CMR 32.60(2). Only solids meeting or exceeding the pH standard will leave the treatment process and be transported from the Facility. All solids transported from the Facility shall be transported in a watertight container or by other means acceptable to the DEP pursuant to 310 CMR 32.40(2).

Provided the Facility is constructed and operated as stated herein, no offensive odors are anticipated.

3. <u>Offensive Noise</u>

The Facility proposed by the Proponent is located in an industrial zone. There are no unusual mechanical elements of the Facility that might create a harmful or noisome level of noise.

The Facility shall comply with the DEP noise regulations, 310 CMR 7.10(1), and the Town of Raynham's By-law 2/11.2 entitled, "By-Law Prohibiting Unnecessary, Excessive or Unusual Noises".

The Site is served by a well-traveled State highway, Route 138. The Site is co-located with the Raynham-Taunton Greyhound Park which has thousands of daily vehicular trips. Vehicular traffic from the Site is insignificant to the locus, and is actually being reduced from current use levels.

Provided the Facility is constructed and operated as stated herein, no offensive noise levels are expected to be generated by mechanical equipment or vehicular traffic.

4. <u>Pests and Vermin</u>

The wastewater will be completely contained within vessels and processing piping until the treatment process has been completed. No outdoor composting of any kind will be undertaken. The solids, only after reaching a minimum pH level of 12, will be permitted to complete the treatment process. This pH level is harmful to pests and vermin. Routine testing and record keeping is already required by the DEP in order to ensure that this pH level is maintained. The Proponent shall contract with a licensed pest control contractor as a secondary safeguard. No offensive pest or vermin problems are anticipated due to the required pH level.

5. <u>Inter-Municipal Sewer Agreement</u>

Due to the Facility's large daily treatment capacity of 99,500 gallons, no occupancy permit shall be granted until such time as an inter-municipal sewer agreement between the City of Taunton and the Town of Raynham – amending and/or replacing such an agreement which was

previously executed by the City of Taunton and the Town of Raynham – has been authorized and executed. This restriction shall not prevent the proponent from obtaining a building permit and constructing the facility. If the proponent undertakes to construct the facility prior to the authorization and execution of such inter-municipal agreement, such undertaking is at proponent's own risk.

6. <u>Future Action Reserved</u>

The Board in rendering its findings and determinations has relied upon the DEP's issuance of required permits and approvals, and the testimony provided by the Proponent in such areas as Facility design and operation. Pursuant to M.G.L. c.111, Section 143, the Board's determination that no offensive or harmful circumstance is currently anticipated does not preclude the Board from re-asserting its jurisdiction in the future should the Facility create offensive noise, odors or other harmful conditions. Nothing contained in this decision shall be construed as a waiver of the Board's rights under law, all of which are expressly reserved.

By The Raynham Board of Health, dated 12/23/2003.

_____
Donald L. McKinnon, Chairman

_____
Raymond W. Platt

_____
Gordon D. Luciano